Filed 6/27/22 P. v. Wood CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE, | F082011 |
| Plaintiff and Respondent, | (Super. Ct. No. BF180661A) |
| v. | |
| CONRAD WOOD, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County. John R. Brownlee, Judge.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Franson, J. and Peña, J.

Defendant Conrad Wood was convicted of five offenses surrounding the kidnapping of and domestic violence toward Jane Doe. He was sentenced to a total term of 12 years' imprisonment, including an upper term on count 1, and he was ordered to pay restitution and various fines and assessments. On appeal, defendant contends that (1) the trial court erred in imposing restitution, fines, and assessments without assessing his ability to pay, (2) his counsel was ineffective for failing to object to imposition of restitution, fines, and assessments on appropriate grounds, (3) his sentence must be vacated and his case remanded for resentencing in light of Senate Bill No. 567's (2021–2022 Reg. Sess.) (Senate Bill 567) amendments to Penal Code[1] section 1170, subdivision (b); and (4) his sentence must be vacated and the case remanded for the trial court to exercise the discretion newly granted as a result of Assembly Bill No. 518's (2021–2022 Reg. Sess.) (Assembly Bill 518) amendments to section 654, subdivision (a). The People disagree on all accounts. We conclude that the factual findings underlying defendant's sentence are inconsistent with section 1170, subdivision (b), but the error[2] was harmless. However, we further conclude that defendant is entitled to the benefit of Assembly Bill 518 and remand for resentencing would not be futile. Accordingly, we vacate defendant's sentence and remand for resentencing.

## PROCEDURAL SUMMARY

On June 1, 2020, the Kern County District Attorney filed an information, charging defendant with kidnapping (§ 207, subd. (a); count 1), infliction of corporal injury upon Jane Doe, a person with whom he was formerly in a dating relationship (§ 273.5, subd. (a); count 2), making criminal threats (§ 422, subd. (a); count 3), false

---

[1] All further references are to the Penal Code.

[2] Throughout our discussion, we refer to section 1170, subdivision (b) "error." However, we note that at the time the trial court sentenced defendant, it correctly applied the then-existing law. Accordingly, while we refer to section 1170, subdivision (b) "error," we are mindful that the trial court complied with the applicable law at the time of sentencing.

2.

imprisonment (§§ 236, 237, subd. (a); count 4) and dissuading a witness by violence or threats of force or violence (§ 136.1, subd. (c)(1); count 5).

On September 21, 2020, a jury found defendant guilty on all counts. On count 5, the jury specifically found that defendant made a threat of force or violence to dissuade the witness.

On October 20, 2020, the trial court sentenced defendant to an aggregate term of 12 years' imprisonment as follows: on count 1, eight years (the upper term); on count 2, one year (one-third the middle term), to be served consecutively to the term on count 1; on count 3, three years (the upper term), stayed pursuant to section 654; on count 4, three years (the upper term), stayed pursuant to section 654; and on count 5, three years (the full middle term) to be served consecutively to the term on count 2 (§ 1170.15 [requiring imposition of the "full middle term of imprisonment" when imposing a consecutive sentence for crimes against a witness]). The trial court also imposed restitution in an amount to be determined at a later date (§ 1202.4, subd. (f)), the statutory minimum restitution fine of $300 (§ 1202.4), a stayed parole restitution fine (§ 1202.45), a court operations assessment of $40 per count of conviction (§ 1465.8 subd. (a)(1)), a court convictions assessment of $30 per count of conviction. The court operations assessments and court convictions assessments were stayed as to counts 3 and 4.

On October 27, 2020, defendant filed a notice of appeal.

### FACTUAL SUMMARY

**The People's Case**

Jane Doe had known defendant for 15 or 16 years. They were twice in a dating relationship in that time. They have one child together and Jane has three other children of whom defendant is not the father. The first dating relationship between Jane and defendant began when they were about 17 years old and lasted for several years. They began dating again "[r]ecently" and the relationship terminated on April 10, 2020, the date of the incident giving rise to this case.

3.

On April 10, 2020, Jane lived with defendant and Brian Crisler in a recreational vehicle or trailer (the trailer) on Brian's aunt's property. She had lived there for about three months. Jane had known Brian since they were 16 years old; he was a good friend and "like … family" to her. Every day while Jane lived with defendant, she would visit her three other children at the home they shared with their father (the home).[3] While Jane was at the home in the afternoon on the day of the incident, defendant came to the home and sent Jane a text message asking her to come outside. Jane was alone at the home at the time and walked outside to speak to defendant. Defendant said he was going to come inside the home. Jane responded that he was not permitted to be in the home. Defendant told her that he was going inside anyway. Jane walked back to the home and defendant followed her. Jane went back to cleaning the home and defendant assisted. Jane told defendant to leave and told him that he was not supposed to be there. Defendant did not leave. Eventually Jane sat on the couch. When she did so, defendant kneed her in the head more than three times, choked her with both hands for less than a minute, slapped her, and punched her.[4] While defendant choked Jane, she slid from the couch onto the floor. He stopped briefly and then punched Jane repeatedly—"[m]aybe about four or five times"—on the left side of her head and jaw as she attempted to cover herself in the fetal position. As defendant struck Jane, she faded in and out of consciousness.

After defendant stopped striking Jane, he told her to come with him or he would " 'beat[] [her] f[*****]g ass again.' " Jane was scared. Defendant dragged her outside.[5] On the front porch, defendant hit Jane again on the head because she said she did not

---

[3]    At the preliminary hearing, Jane testified that she lived at the home.

[4]    Jane described defendant hitting her with a "fist" on the jaw and "socking" her.

[5]    Jane originally testified that she walked outside, she later corrected the testimony to explain that defendant dragged her outside by her short-cropped hair and sweater.

4.

want to go with him. Defendant took Jane's cellular phone.[6] Defendant then made Jane sit on the handlebars of a BMX bicycle that he then used to transport them about three blocks to defendant's friend's house. Defendant attempted to make Jane go into a specific room of the house. She sat against a tree outside the house and defendant punched her on the nose. He then poured water on her because she had again lost consciousness. Not long after they arrived at defendant's friend's house, Brian arrived in his vehicle. Defendant told Jane to get into Brian's vehicle or he would hit her again. Jane was scared that he would hit her again, so she got into the back seat of Brian's vehicle. Defendant also got into the back seat of Brian's vehicle.

Brian then began driving the vehicle to his aunt's property. Brian told defendant he could not take Jane to his aunt's house " 'looking like this.' " Defendant responded that he would " 'make [Jane] cover her face and she will shut up.' " Jane did not want to go to Brian's aunt's house. She told defendant from "the time [she] was [seated against] the tree until he took [her]" to the home that she wanted to go to the hospital. When they arrived at Brian's aunt's property, defendant made Jane go to the trailer and lay in the bed. Defendant then told Jane that she did not "deserve to be treated like this." He agreed to take her to the home where her children resided with their father but told her if she presses charges "he[] will kill [her] when he gets out." Defendant then drove Jane back to the home in Brian's vehicle.[7]

When defendant and Jane returned to the home, defendant made Jane stay in Brian's vehicle while defendant went into the home to retrieve a knife that he left there. When defendant returned to the vehicle, Jane exited the vehicle, went into the home, and

---

**6** Jane acknowledged that she testified at the preliminary hearing that defendant took her phone as she got on the bicycle or after she got off of the bicycle.

**7** At some point during the encounter, before defendant took Jane home, defendant drove Jane to Daniel E.'s house. Jane did not exit the car.

locked the door. Altogether, defendant hit her at least 15 times.[8] Jane called her sister and told her what happened. Jane's sister called 911. The sheriff's department called Jane soon after she ended the call with her sister. She told the caller that the day of the call was the first time defendant had been physically violent with her. A sheriff's deputy soon came to the home.

As a result of defendant striking, kneeing, and choking Jane, she suffered two black eyes, swelling to her head, severe pain to her head and jaw, and headaches that continued to the date of her testimony.[9]

Jane's sister, Jessica, also testified. Jessica testified that Jane called her on April 10, 2020, crying, and told Jessica that defendant had just "beat[en her] up" and that she was fading in and out of consciousness. Jane told Jessica that she was afraid defendant would come back and beat her up again. Jessica then called the police and drove to Jane.

---

[8] Jane acknowledged that she testified at the preliminary hearing that defendant only hit her four times. She explained that she was nervous and scared at the preliminary hearing.

[9] On cross-examination, defendant's counsel challenged Jane regarding where she lived on the date of the incident; whether she walked outside the home or was dragged out; when defendant told her to get into a vehicle; where defendant took her after the home; whether he ever transported her by bicycle; when, if ever, defendant told her that she did not "deserve to be treated like that"; whether they went to Daniel's house on the date of the incident; when and where defendant threatened to kill Jane if he was prosecuted; where defendant dropped Jane off after they left the trailer; how many times defendant had been physically violent with her; why she declined medical treatment if she believed her jaw was broken; what she was doing when defendant became physically violent with her on the date of the incident; whether defendant kneed her; the order in which he choked and punched her; the number of times that defendant hit her; whether she believed defendant's threat to kill her; and when defendant took her cellular phone. As to each topic, defense counsel directed Jane to her prior statements to law enforcement officers, defense investigators, and the 911 operator. Jane corrected her testimony on only two topics: to explain that defendant had (1) taken her to Daniel's house and (2) dragged her out of the home.

When Jessica arrived at the home, she saw that Jane's "face was swollen on one side, her eye was swollen, and she looked like she was in and out of consciousness." Jane's words were slurred, she appeared to be dizzy, and she could barely stand.

Kern County Sheriff's Deputy Jessika Zavala was dispatched to the home at 8:30 p.m., on April 10, 2020. Zavala found Jane in the driveway of the home and noticed that she had swelling to her left eye and a small laceration to her lip. Jane was shaking and crying.

Jane made a statement to Zavala that contained discrepancies from her trial testimony. She initially told Zavala that defendant made her leave the home in a vehicle—rather than defendant's bicycle—and drive to a tire shop—rather than defendant's friend's house. She later amended her statement to Zavala, explaining that defendant was riding a bicycle and forced her to go to a tire shop from which Brian picked them up. Jane also told Zavala that defendant told her that she did not " 'deserve to be treated like that' " in Brian's vehicle rather than in the trailer. Jane did not tell Zavala that she had gone to defendant's friend's house or Brian's trailer that day, but she did tell Zavala about going to Brian's aunt's house (located on the same lot as the trailer).

On April 11, 2020, Kern County Sheriff's Deputy Austin Burgess arrested defendant. Defendant did not have any visible injuries to his person.

**Defendant's Case**

Brian testified that on April 10, 2020, at about 4:30 p.m., he picked defendant and Jane up from a convenience store. Defendant told Jane to get into Brian's vehicle. Defendant did not yell. Jane appeared calm and did not appear as though she had been crying. Defendant and Jane entered the vehicle. Brian did not see any injuries to Jane when she entered the vehicle, but she did not appear to be happy. Brian drove defendant and Jane to the trailer to get cigarettes while defendant and Jane stayed in his vehicle. Defendant and Jane never entered the trailer on that date.

When Brian reentered his vehicle, he drove defendant and Jane about two miles to Daniel's house. Jane did not ask to go to the hospital and was not crying. She did not ask to get out of the vehicle. She did not appear to have a bloody nose. Defendant did not threaten or hit Jane in Brian's presence. When they arrived at Daniel's house, Brian exited the vehicle and allowed defendant to take Jane home.

Brian testified that he was good friends with defendant and Jane. He had not spoken to Jane since April 10, 2020, but he had spoken to defendant more than 10 times and had given defendant money while he was in custody. Brian never spoke to defendant about the events of that day.

The prosecutor played an audio recording of jail calls from defendant to Brian on April 11, 2020, and a different unidentified date prior to trial. The relevant portions of the April 11, 2020, call are as follows:

> "[Defendant]: Brian, she did it dog.

> "[Brian]: I don't know what to tell you stud you did it. You know what I mean? I … [¶]… [¶]

> "[Defendant]: … listen, listen, listen. I did that, I did beat her up, I did do that, but all this other sh** she's saying I did I didn't do that. [¶] She said I threatened to kill her if she didn't get in the car. I never told her that I told her come on let's go we're leaving. Like, I didn't did you hear me threaten to kill her at all?

> "[Brian]: No."

The relevant portions of the second call are as follows:

> "[Defendant]: Brian, I'm going to trial homeboy.

> "[Brian]: You know I got your back to the fullest 100%. 'Cause it's like f****n' day one dog you know I got you.

> "[Defendant]: I know this. I'm gonna put you down as a witness for me you know."

> "[Brian]: Yeah.

8.

"[Defendant]: And b- and because you're the, bro you're the only one that can ever say that you ever, ever seen me show any violence towards her, so…."

Brian maintained that his trial testimony was true.

The defense called two defense investigators who testified to the discrepancies between Jane's trial testimony and her statements to them. The discrepancies included the locations to which defendant and Jane travelled, when and where defendant made specific statements, and where defendant dropped her off.

## DISCUSSION

### I. Senate Bill 567

Defendant contends that we must vacate the sentence and remand the matter because defendant did not admit, and the trial court did not find true, the facts underlying the four circumstances in aggravation that the trial court relied upon in imposing the upper term. The People agree that Senate Bill 567 is retroactive to defendant but argue that the imposition of the upper term is harmless beyond a reasonable doubt because the jury would have found the facts underlying "at least one" of the four aggravating circumstances relied upon by the trial court true beyond a reasonable doubt. The People are mistaken regarding the relevant standard for harmless error, but we agree that the error was harmless. As we explain below, whether the jury would have found true beyond a reasonable doubt the facts underlying *at least one* of the aggravating circumstances is not the relevant question in this context. Instead, to find that the error was harmless we would have to conclude (1)(a) beyond a reasonable doubt that the jury would have found beyond a reasonable doubt that the facts underlying at least one aggravating circumstances was true, and (1)(b) that there is no reasonable likelihood the jury would not have found the remaining circumstances true beyond a reasonable doubt, or (2) that there is no reasonable likelihood the trial court would have imposed a lesser

9.

term based on the aggravating circumstances that would have been provable to the jury beyond a reasonable doubt.[10]

## A. Additional Background

The probation officer's report identified no circumstances in mitigation of the offense and the following four circumstances in aggravation:

"(1). … [D]efendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous.

"(2). … [D]efendant has served five prior prison/[section] 1170[, subdivision] (h) terms.

"(3). … [D]efendant was on Post-Release Community Supervision when the crime was committed.

"(4). … [D]efendant's prior performance on juvenile probation, misdemeanor and felony probation, Post-Release Community Supervision, and Mandatory Supervision was unsatisfactory in that he violated terms and re-offended."

At the sentencing hearing, the trial court indicated that its "tentative [ruling was] to follow probation's recommendation." It then allowed argument from the parties. The People argued in favor of the court imposing the sentence recommended by the probation officer based on the aggravating circumstances articulated by the probation officer. Defendant's counsel did not address the probation officer's recommendation. The trial court then found true the mitigating and aggravating circumstances as recommended by the probation officer. Specifically, it noted that:

"defendant's criminal history is extensive and began in the year 2000 as a juvenile. Since then the defendant's criminality has resulted in over 23 appearances before the Court for a variety of theft and drug-related offenses. [¶] He's been given numerous opportunities on all forms … of

---

**10** In order to reach the second step, the reviewing court must conclude beyond a reasonable doubt that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. Otherwise, the sentence violates the Sixth Amendment.

supervised release, yet continued to reoffend. The defendant has clearly demonstrated he had no interest in rehabilitation."

In light of those circumstances in aggravation and the existence of no circumstances in mitigation, the trial court concluded "the upper term in sentencing [was] justified and w[ould] be ordered." It therefore imposed the upper term on count 1.

## B. Analysis

From March 30, 2007, to January 1, 2022, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term … rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).)

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) A trial court is permitted to rely upon a certified record of conviction to determine prior criminality for purposes of sentencing without submitting the prior conviction to a jury. (§ 1170, subd. (b)(3).)

As a threshold matter, as the parties agree, as do we, Senate Bill 567 is retroactive to cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (see *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039 [remanding for resentencing under another ameliorative amendment to section 1170 by Senate Bill 567]) and defendant's sentence is not yet final on appeal.

In this case, as to the first circumstance in aggravation, defendant's prior convictions and juvenile adjudications, the record does not reflect that any certified records of conviction or adjudication were submitted as to any of defendant's convictions

11.

or adjudications. Further, none of the facts underling any the four circumstances in aggravation were admitted by defendant or presented to or found true by the jury. Nevertheless, the upper term was imposed on count 1. The sentence imposed is therefore not in compliance with section 1170, subdivision (b)(2), as amended by Senate Bill 567. Therefore, unless imposition of the upper term on count 1 was harmless, the sentence must be vacated and the matter must be remanded to the trial court for resentencing in compliance with section 1170, subdivision (b).

The People contend that "any error is harmless because a jury would have found at least one of the aggravating factors relied upon by the trial court true beyond a reasonable doubt." For that proposition, they rely on *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), which applied the harmless-beyond-a-reasonable-doubt standard of harmless error from *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) as adapted to the context of violations of the Sixth Amendment right to a jury trial on aggravating circumstances by *People v. Sandoval* (2007) 41 Cal.4th 825, 838–839 (*Sandoval*).[11] (*Flores*, at pp. 500–501.) *Flores* articulated the harmless error standard in the Senate Bill 567 error context as follows: " '[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true *at least a single aggravating circumstance* had it been submitted to the jury,' the error is harmless." (*Flores*, at p. 500, italics added.) We respectfully disagree with the People and *Flores* that *Sandoval* applies in this context. A reviewing court concluding beyond a reasonable doubt that the jury would have the facts underlying

---

[11] *Sandoval*, as we explain in more detail below, considered the standard for harmless error in the context of *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) error—where a sentence in excess of the statutory maximum sentence was imposed under California's former determinate sentencing law without submitting the facts authorizing such a sentence to a jury.

12.

*a single circumstance in aggravation* true beyond a reasonable doubt is insufficient to conclude that any error under section 1170, subdivision (b) was harmless.

To explain our disagreement with *Flores*, we consider the origin of the harmless error standard it applied. In *Cunningham*, the Supreme Court held that California's determinate sentencing law (as it existed from 1977 to 2007) violated the Sixth Amendment right to a jury trial because it permitted a trial judge to determine facts (other than a prior conviction) that would allow imposition of a sentence in excess of the statutory maximum.[12] (*Cunningham*, *supra*, 549 U.S. at pp. 275–276.) As *Cunningham* explained, the Supreme Court had long held that any fact that permitted imposition of a sentence beyond the statutory maximum had to be proved to a jury beyond a reasonable doubt. (*Id*. at p. 281.) Under the California determinate sentencing law, a statutory presumption existed that " '[t]he middle term [would] be selected unless imposition of the upper or lower term [was] justified by circumstances in aggravation or mitigation.' " (*Id*. at p. 278.) Under the then-existing statutory scheme, those circumstances in aggravation or mitigation—and the underlying facts related to those circumstances— were to be determined by the trial court, not the jury. (*Ibid*.) The Supreme Court therefore determined that the imposition of an upper term without having the facts underlying the aggravating circumstances proved to a jury beyond a reasonable doubt violated the Sixth Amendment. (*Id*. at p. 293.)

In *Sandoval*, our Supreme Court considered whether an upper-term sentence imposed pursuant to the pre-*Cunningham* determinate sentencing law—i.e., imposed based on judicial findings of fact on circumstances in aggravation—was harmless error under the Sixth Amendment. (*Sandoval*, *supra*, 41 Cal.4th at p. 837.) It explained that the trial court had relied upon six aggravating circumstances, none of which had been

---

[12]    In the Sixth Amendment context, the statutory maximum " 'is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings.' " (*Cunningham*, 549 U.S. at p. 275.)

13.

proved to a jury, admitted by the defendant, or based on the fact of a prior conviction. (*Id.* at pp. 837–838.) The upper-term sentence therefore violated the defendant's Sixth Amendment rights under *Cunningham*. The *Sandoval* court then considered whether the violation was harmless. To that end, it articulated the following standard: "if a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Sandoval*, at p. 839.) In the Sixth Amendment context, the issue was whether the "defendant [was] *eligible* for the upper term …"; the trial court's consideration of additional factors not proved to a jury was not a federal constitutional question. (*Id.* at p. 839.)

As noted, in *Flores*, the Court of Appeal for the First District, Division Three extended the standard for harmless error applied in the Sixth Amendment context in *Sandoval* to section 1170, subdivision (b)(2) error.[13] (*Flores*, *supra*, 75 Cal.App.5th at pp. 500–501.) The Court of Appeal for the Fourth District, Division One disagreed with *Flores* on that point. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 465–468, & 468, fn. 11 (*Lopez*).)

The court in *Lopez* agreed with *Flores* that section 1170, subdivision (b)(2) error is subject to a harmless error analysis: "where a sentencing factor must be found true by a jury beyond a reasonable doubt and the court fails to submit that factor to the jury, the error in the court's reliance on that fact may be subject to harmless error review as to whether the lack of a finding by the jury was prejudicial." (*Lopez*, *supra*, 78 Cal.App.5th at p. 465.) But *Lopez* disagreed with *Flores* on the correct standard for harmlessness. Instead of the *Sandoval* harmless error standard, the *Lopez* court applied the following

---

**13** The *Flores* court did not explain why it concluded that the harmless error test applied in *Sandoval* applies in this context.

two-part standard for harmlessness: First, "[i]n order to conclude that the trial court's reliance on improper factors that were not found true by a jury[,] … admitted by [the defendant, or based on certified records of conviction] was not prejudicial, [the reviewing court] would have to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury (see § 1170, subd. (b))." (*Lopez*, at pp. 465–466.) According to *Lopez*, if that conclusion is made, the defendant has suffered no prejudice. (*Id*. at p. 467 & fn. 11.) If not, the reviewing court "then consider[s] the second question, which is whether [it] can be certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)], that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez*, at p. 467, fn. 11.)

   *Lopez* reasoned it is not enough that the reviewing court conclude that a trial court was *permitted* to impose the upper term because the jury would have found true a single aggravating factor beyond a reasonable doubt; whether the trial court *could have* imposed the upper term did not completely resolve the issue. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467.) Instead, when a reviewing court concludes beyond a reasonable doubt that a jury would have found true fewer than all the aggravating circumstances beyond a reasonable doubt, it must still ask whether it is reasonably probable the trial court "*would have exercised its discretion*" to impose a sentence less than the upper term in the absence of the unproved aggravating factor(s). (*Ibid*.)

15.

We agree with the *Lopez* court that a reviewing court finding beyond a reasonable doubt that the jury would have found a single aggravating factor true beyond a reasonable doubt is insufficient to conclude that the error was harmless. In other words, we disagree with *Flores* that *Sandoval* is applicable in this context. We further agree that the second step of the *Lopez* analysis—considering whether the trial court would have imposed a lesser term in absence of the aggravating factors not provable on the record before the reviewing court—is necessary. To find that section 1170, subdivision (b) error is harmless when fewer than all of the factors relied upon by the trial court could have been proved to the jury, we must determine whether the trial court would nevertheless have imposed the upper term based on the remaining aggravating factors.

Despite our agreement with *Lopez* on the majority of the standard it articulated, we are unconvinced that the *Chapman* standard of harmless error—applicable to errors implicating federal constitutional rights—must be applied to *all* aggravating factors in the *Lopez* court's first step. *Lopez* does not provide a clear explanation for why the *Chapman* standard for harmless error applies to all aggravating circumstances. Indeed, the only citation that the *Lopez* court provides for the proposition that *Chapman* applies to every factor is citation to section 1170, subdivision (b), itself. While *Sandoval* directs that at least one aggravating factor must be proved to the *Chapman* harmless error standard to satisfy the Sixth Amendment (i.e., for it to be *permissible* for the trial court to impose the upper term consistent with the Sixth Amendment), ordinary errors of state law are subject to review pursuant to *Watson*, *supra*, 46 Cal.2d 818.[14] (*People v. Breverman* (1998) 19

---

[14]    The test under *Watson* is whether, " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) In this context, the question for the reviewing court would be whether there is a reasonable probability that the trial court would not have found the aggravating circumstance(s) beyond a reasonable doubt.

16.

Cal.4th 142, 171 [when a state statutory right to a jury determination is violated, such error "is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the *Watson* harmless error test"; "the state-created right to jury determination" does not implicate federal due process interests].)

We note that the *Chapman* standard of harmless error is compelled when an element of an offense or a sentencing factor necessary to impose a sentence above the statutory maximum is not presented to the jury. (*Washington v. Recuenco* (2006) 548 U.S. 212, 220 [firearm enhancement sentencing factor harmless error is decided pursuant to *Chapman*]; *People v. French* (2008) 43 Cal.4th 36, 52–53 [applying only *Chapman* where the trial court imposed the upper term based on *one* aggravating circumstance and that circumstance was not proved to the jury].) A fact that is *necessary* to impose a sentence above the statutory maximum must be proved to a jury beyond a reasonable doubt. However, as *Sandoval* has made clear, when multiple aggravating circumstances not proved to the jury are relied upon by a trial court in imposing the upper term, the reviewing court must only conclude beyond a reasonable doubt that *one* of those circumstance would have been found true by the jury beyond a reasonable doubt to avoid offending the Sixth Amendment. (*Sandoval*, *supra*, 41 Cal.4th at p. 839 [so long as a defendant is eligible for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury].) Accordingly, one aggravating circumstance must be reviewed pursuant to *Chapman*, but the remaining aggravating circumstances involve only a state-created right to a jury trial that must be reviewed pursuant to *Watson*.

In sum, we think the correct standard for harmless error lies between the standards articulated in *Flores* and *Lopez*; *Flores* sets too low a standard for harmlessness and

17.

*Lopez* too high.  We instead apply a version of the standard articulated in *Lopez*, modified to incorporate *Watson* in the first step:  The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.  If the aggravating circumstances would have been proved to the respective standards, any error was harmless.  If not, we move to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps.  If the answer is no, the error was harmless.  If the answer is yes, we vacate the sentence and remand for resentencing consistent with section 1170, subdivision (b).

With that standard in mind, we revisit the aggravating circumstances relied upon by the trial court.  The trial court relied upon defendant's numerous prior convictions and sustained juvenile convictions, his five prior prison or section 1170, subdivision (h), felony terms of local confinement, his postrelease community supervision status at the time of the commission of the offenses in this case, and his prior unsatisfactory performance on juvenile, misdemeanor, and adult probation based on violations of terms of probation and the commission of new offenses.  We conclude beyond a reasonable doubt that the jury would have found true beyond a reasonable doubt that defendant had suffered numerous prior convictions and juvenile adjudications.  We further conclude that there is no reasonable probability[15] that the jury would not have found true beyond a reasonable doubt that defendant had served five prior prison terms and/or terms of felony local imprisonment and was on postrelease community supervision when he committed

---

[15]     We would reach the same conclusion if we applied the *Chapman* standard.

18.

the crimes in this case.[16] Defendant did not object to any of the criminal history or supervision circumstances identified in the probation report. There is no logical reason that he would not have done so if that information had been incorrect. Next, as to defendant's poor performance on probation, parole, and supervised release insofar as it was based on commission of new offenses for which defendant was convicted, we conclude there is no reasonable probability the jury would not have found true beyond a reasonable doubt that defendant's performance in that respect was unsatisfactory. Again, those facts could readily have been established from court records. However, insofar as defendant's poor performance on probation was based on one or more violations of the terms of probation, that circumstance would have required a prove-up of each of the violations of probation at issue. The record contains no evidence relating to those violations of probation. We therefore cannot conclude beyond a reasonable doubt that the jury would have found that portion of the aggravating circumstances true beyond a reasonable doubt.

The trial court found no circumstances in mitigation, and as discussed above, the jury would have found at least three factors true beyond a reasonable doubt. The trial court emphasized defendant's "extensive" criminal history that began in 2000, his 23 appearances before the court on theft- and drug-related offenses, and his reoffending conduct while on "all forms of … supervised release …." Based on the trial court's comments, its imposition of the upper term was based primarily on defendant's criminal history and record of reoffending while on release—facts that the jury would have found true beyond a reasonable doubt. In light of that record, we must conclude that there is no reasonable possibility that the trial court would have imposed a term less than the upper

---

**16** We note that defendant's criminal history did not need to be proved to a jury. The trial court could instead have relied upon a certified record of conviction for those offenses. (§ 1170, subd. (b)(3).)

term in light of the factors that would have been found true beyond a reasonable doubt. The error was harmless.

## II.  Assembly Bill 518

Effective January 1, 2022, Assembly Bill 518 modified section 654, subdivision (a), to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions."  (Stats. 2021, ch. 441, § 1.) Previously, an act or omission punishable under two or more provisions of law was to be punished under the provision that provided for the longest term of imprisonment. (Former § 654, subd. (a).)

Under *In re Estrada*, *supra*, 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.)  This presumption has been extended to amendments providing trial courts discretion to impose lesser punishment at sentencing. (See, e.g., *People v. Garcia* (2018) 28 Cal.App.5th 961, 971−972 [Senate Bill No. 1393 (2017−2018 Reg. Sess.) (Stats. 2018, ch. 1013, §§ 1−2)]; *People v. Valenzuela* (2018) 23 Cal.App.5th 83, 87−88 [Senate Bill No. 620 (2017−2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1−2)].)  Nothing in Assembly Bill 518 suggests legislative intent that the amendments apply prospectively only, and as previously noted, defendant's case did not become final before January 1, 2022.

" ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court" ' " (*People v. Flores* (2020) 9 Cal.5th 371, 431–432, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391), unless it is clear from the record that "remand would be an idle act" (*People v. Flores*, *supra*, at p. 432).

The People argue that despite the trial court's newly granted authority, remand would be an idle act because the trial court indicated its intent to impose the maximum

20.

possible sentence. We disagree. The trial court imposed the upper term on count 1 and determined that consecutive sentencing was appropriate because it concluded that the criminal objectives of counts 1, 2, and 5 were separate from each other. However, the trial court did not have discretion regarding the sentences imposed on counts 2 and 5. The trial court was required to impose one-third of the middle term on count 2 (§ 1170, subd. (a)) and the full middle term on count 5 (§ 1170.15). It did not have the option to stay the sentence on either count in favor of executing the sentence on counts 3 or 4, which would have resulted in lesser terms of imprisonment. Further, the trial court did not comment on the severity of any of the offenses of conviction or otherwise express an intent to impose the upper term on all counts. (Cf. *People v. McVey* (2018) 24 Cal.App.5th 405, 419 [declining to remand for the trial court to exercise its discretion to strike a firearm enhancement where it elected to impose the maximum enhancement and relied upon four case-specific aggravating factors regarding defendant's firearm use including the lack of provocation, defendant's lack of remorse, and his " 'callous reaction' " to repeatedly shooting an unarmed man in imposing that enhancement; the trial court also described defendant's conduct as " 'pretty haunting' "].) We would be remiss to infer that the trial court would not have exercised its discretion to stay terms that provided for lesser terms of imprisonment where the sentences on counts 3 and 4 were statutorily mandated, the trial court made no explicit expression of intent to impose the maximum possible sentence, and the trial court did not comment on the severity of any of the offenses in making its sentencing choices. We will therefore vacate defendant's sentence and remand to the trial court for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

We express no opinion on which counts the trial court should stay or the appropriate sentence.

## DISPOSITION

Defendant's sentence is vacated, and the matter is remanded for resentencing.[17] In all other respects, the judgment is affirmed.

---

[17] Because we vacate defendant's sentence and remand for resentencing, we leave the trial court to address in the first instance defendant's arguments regarding the imposition of fees and fines without assessing his ability to pay.